In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2679

ARLENE SIMPSON,

*Plaintiff-Appellant,*

*v.*

FRANCISCAN ALLIANCE, INC., d/b/a
FRANCISCAN ST. JAMES HEALTH,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 5857 — **Manish S. Shah**, *Judge.*

ARGUED APRIL 27, 2016 — DECIDED JUNE 28, 2016

Before FLAUM, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Arlene Simpson, a registered nurse, claimed that she was fired from her job in a surgical unit at Franciscan St. James Health principally because she is over age 40 and African American. The district court granted St. James's motion for summary judgment, reasoning that

Simpson had established a prima facie case of discrimination
under the indirect method of *McDonnell Douglas Corporation
v. Green*, 411 U.S. 792 (1973), but lacked evidence that the de-
fendant's explanation for firing her was pretextual. We con-
clude, however, that Simpson did not even establish a prima
facie case of discrimination, let alone that the proffered expla-
nation was pretextual. We thus affirm the district court's
judgment.

## I. Background

Simpson began working at St. James in 2008. She wasn't
reprimanded for violating any hospital rules until after 2009
when Maureen Kelly, a Caucasian woman, became the pa-
tient-care manager for Simpson's department. As manager
Kelly directly supervised Simpson, and from October 2010
through September 2011 she disciplined Simpson four times
using a form called an "Employee Corrective Action Report."
The discipline was progressive, and the fourth incident re-
sulted in the termination of Simpson's employment.

Simpson lodged a charge of age, race, gender, and disabil-
ity discrimination with the Illinois Department of Human
Rights and the Equal Employment Opportunity Commission.
After the EEOC issued a right-to-sue letter, Simpson filed suit
in August 2013, claiming age discrimination in violation of
the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–
634, and race discrimination in violation of Title VII of the
Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17.
(Simpson's complaint also included claims of gender discrim-
ination under Title VII and disability discrimination in viola-
tion of the Americans with Disabilities Act, but those claims
have been abandoned.) Simpson alleged that, despite satisfac-
torily performing her job duties, she had been reprimanded

by Kelly, and ultimately fired, based on false allegations of misconduct.

At summary judgment St. James argued that Simpson could not establish a prima facie case of discrimination, asserting that she had not been performing up to expectations and could not identify a similarly situated coworker who was treated more favorably. St. James pointed to the four Employee Corrective Action Reports and also to unsatisfactory performance evaluations, deposition testimony (including Kelly's testimony that she had addressed a fifth incident of misconduct informally instead of using an Employee Corrective Action Report to reprimand Simpson), and the defendant's manual of policies and procedures. Moreover, St. James added, Simpson was not disputing the existence of the complaints from patients and their families which underlie two of the formal reprimands. The reprimands, St. James argued, provided a nondiscriminatory basis for discharging Simpson, whether or not other evidence established a prima facie case of discrimination.

The first reprimand, from October 2010, asserts that Simpson had disregarded a doctor's orders to change a patient's surgical dressing and stop the patient's controlled pain medication. Three months later, in January 2011, Simpson received the second reprimand, this time accusing her of improperly directing a patient-care technician to take her place for two procedures that required a nurse. That reprimand further accused Simpson of making it appear in one of the patient's files that she had been present for the procedure. Both written reprimands include a warning: "Further omissions in order compliance will result in corrective action up to and including termination." Simpson refused to sign the second

reprimand and, at that time, submitted a response disputing its allegations.

The third reprimand, in July 2011, was issued after St. James had received three complaints from patients in a single month. According to the Employee Corrective Action Report, Simpson confronted a patient after a family member complained to the supervising nurse about Simpson's strong perfume. Then a few days later, the narrative continues, Simpson and another nurse, Nancy Galderia, were rude to a patient who complained about the room's cleanliness. And, finally, a week after that incident, Simpson ignored a doctor's order to connect the suction for a patient's stomach tube, prompting the patient's family to complain that she had acted as if caring for the patient was a bother. This time the written reprimand warned Simpson that "[a]ny further concerns for behavior, attitude, or work performance will result in termination." Simpson submitted a formal appeal from this third reprimand disputing the accuracy of the allegations made by the complaining patients or family members, but did not allege discrimination. The hospital's CEO, along with the director of nursing, the chief nursing officer, and a panel of Simpson's coworkers reviewed her appeal but upheld the reprimand.

The last straw, according to St. James, came two months later in September 2011. According to the narrative of the fourth Employee Corrective Action Report, Simpson confronted a patient and removed her morphine pump prematurely after learning about the patient's complaint that Simpson never brought her ice as promised. By the patient's telling, Simpson said she did not "need any bad marks" against her

and accused the patient of lying about asking for ice. The reprimand, also referencing the previous allegations against Simpson, cites the hospital's "Employee Code of Behavior," which authorizes discharge for "major violations" including "[d]iscourteous, abusive or inconsiderate treatment of patients, visitors, physicians or co-workers." Simpson appealed from this reprimand as well—without alleging any discrimination—and the CEO, director of clinical integration, chief nursing officer, and a panel of Simpson's coworkers all agreed that she should be fired.

St. James also pointed to Simpson's deposition, during which she could not identify any potential comparator. Simpson essentially conceded that she did not have evidence of similarly situated coworkers being treated more favorably: "Everything that's written in the office is between you and the manager … . I just know about myself."

In opposing St. James's motion for summary judgment, Simpson argued that the defendant's reliance on the Employee Corrective Action Reports was pretextual. Simpson asserted that she had been held to a higher standard than employees who are not African American or were younger than 40. She submitted favorable reviews received from supervisors and patients before Kelly's arrival and a negative review that Kelly had written in 2010. Simpson disputed the truth of the accusations from patients and family members recounted in the reprimands but did not dispute that the accusations had been made.

Simpson also submitted her own affidavit attesting to personal knowledge of two white nurses, one of them under age 40, who had not been fired or even disciplined after St. James had received complaints from patients. One of those nurses,

Simpson asserted, had been accused by a patient of being rude and unprofessional, and the other nurse had received five or six patient complaints in a single day.

Felicia Carter, another nurse at St. James, echoed Simpson's affidavit, and likewise asserted personal knowledge of two other nurses who were not disciplined, one after failing to properly monitor a patient and the other despite chronic tardiness. Carter stated that "performance deficiencies were discussed openly" at St. James and that she regularly overheard "managers and employees discussing performance deficiencies."

Simpson did not present any direct evidence of discrimination, so the district court analyzed her claims under the *McDonnell Douglas* indirect method. The court reasoned that the affidavits from Simpson and Carter concerning other nurses were enough to raise an inference that St. James had applied its rules disparately, thus establishing a prima facie case of age and race discrimination. But the court nevertheless concluded that Simpson had not presented evidence from which a jury reasonably could find that the defendant's proffered explanation for firing her—the accumulation of four written reprimands—was pretextual.

## II. Analysis

Simpson argues that the district court erred in granting summary judgment because the veracity of St. James's proffered explanation for firing her is a question for a jury. Simpson also insists that the patients and family members who complained about her were not telling the truth.

We review the grant of summary judgment de novo, construing all admissible evidence and reasonable inferences in

the light most favorable to Simpson. *See Bordelon v. Bd. of Educ. of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016). We note that the *McDonnell Douglas* burden-shifting framework applies to claims of both age and race discrimination. *See Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015). Under the indirect method, the plaintiff has the initial burden of producing evidence showing that (1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 880 (7th Cir. 2016). Only when the plaintiff has established this prima facie case does the burden shift to the defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014).

The district court's analysis is internally inconsistent. The disputed elements of Simpson's prima facie case—whether she was meeting St. James's legitimate job expectations and whether similarly situated employees outside of her protected classes were treated more favorably—overlap with, and cannot be separated from, the question of whether the defendant's explanation for firing her is pretextual. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 463 (7th Cir. 2014); *Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013); *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 491 (7th Cir. 2008); *Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 741–42 (7th Cir. 2002). Evidence that St. James selectively enforced its rules against Simpson—if there is such evidence—would go

to both the prima facie case and the question of pretext. *See Baker v. Macon Res., Inc.*, 750 F.3d 674, 677 (7th Cir. 2014); *Coleman v. Donahoe*, 667 F.3d 835, 857–58 (7th Cir. 2012); *Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 561 & n.3 (7th Cir. 1998). If a jury could find that St. James applied its rules disparately, then the defendant would not be able to plausibly assert that its application of those same rules was a nonpretextual reason for firing Simpson. St. James continues to argue, however, that Simpson did not submit evidence establishing a prima facie case, so we can affirm the grant of summary judgment on that ground if we find it persuasive. *See Dibble v. Quinn*, 793 F.3d 803, 807 (7th Cir. 2015); *Tully v. Barada*, 599 F.3d 591, 594 (7th Cir. 2010).

We agree with St. James that Simpson did not make out a prima facie case for either age- or race-based discrimination because the record does not contain any admissible evidence that a similarly situated employee outside of her protected classes was treated more favorably. Although comparators do not have to be identical in every conceivable way, they cannot be "similarly situated" unless they are directly comparable in all material aspects. *See Sweatt*, 796 F.3d at 709; *Coleman*, 667 F.3d at 846.

Simpson and Felicia Carter asserted personal knowledge of other nurses who were not fired or even disciplined despite engaging in workplace misconduct, including behavior that prompted patient complaints. But at summary judgment Simpson did not submit admissible evidence of other nurses receiving favorable treatment—i.e., not being disciplined after engaging in misconduct—nor did Simpson supply a foundation for the contention that she and Carter have personal

knowledge of the alleged misconduct and the defendant's reaction. *See Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998). Instead, Simpson presented only vague, conclusory assertions about incidents outside her personal knowledge. *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003).

Simpson's affidavit does not explain *how* she possibly could possess personal knowledge of the patients' complaints or the reaction to those complaints by hospital managers. In fact, during her earlier deposition, Simpson had conceded that she did not know of any similarly situated St. James employee who was not disciplined after engaging in comparable misconduct, and she also had conceded that personnel information is kept between the employee and the supervisor. Simpson cannot contradict these admissions without explaining the basis of her personal knowledge in a later affidavit in order to survive summary judgment. *See Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005); *Adusumilli v. City of Chicago*, 164 F.3d 353, 360 (7th Cir. 1998). And Carter's affidavit, even more obviously than Simpson's, likewise rests on inadmissible hearsay.

The record does include one e-mail discussing a patient's complaint that Simpson and another nurse, Galderia, were rude. But even accepting Simpson's assertion that Galderia was not disciplined (again, how would Simpson know?), this one incident isn't functionally equivalent to the conduct that resulted in Simpson's discharge. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690–91 (7th Cir. 2008). An employee who does not have a similar disciplinary history and performance record as the plaintiff is not similarly situated. *See Amrhein v.*

*Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008). Simpson's reprimand for this episode came after she allegedly went back and *confronted* the patient upon learning of the patient's complaint, and there is no evidence that Galderia compounded her initial rudeness in a similar way. Moreover, Simpson had gotten two other complaints from patients or family members that same month, and she received three other reprimands before she was fired. Simpson did not obtain evidence concerning the defendant's investigation of the complaint against Galderia, and she does not suggest that Galderia engaged in other misconduct beyond this single incident. Thus, putting aside the lack of admissible evidence concerning the reaction of management to Galderia's misconduct, she and Simpson are not at all comparable.

St. James provided a legitimate, nondiscriminatory explanation for discharging Simpson: Her arrogance had generated multiple complaints culminating in the conclusion of management (and even coworkers) that Simpson had engaged in "[d]iscourteous, abusive or inconsiderate treatment of patients, visitors, physicians or co-workers." Simpson does not dispute that St. James received the four complaints from patients and family members which underlie the third and fourth Employee Corrective Action Reports. And at summary judgment Simpson did not offer any evidence suggesting that the doctor did not initiate the first reprimand, which states that she failed to follow the physician's order, nor did she attempt to contradict the reprimand by deposing the doctor. Although Simpson disputes the accuracy of the accusations leading to the reprimands, the relevant inquiry is whether the stated reason for an adverse employment action is in fact the reason for that action, not whether the action was free of mistake or even fair. *See Zayas v. Rockford Mem'l Hosp.*, 740 F.3d

1154, 1158–59 (7th Cir. 2014); *Perez v. Thorntons, Inc.*, 731 F.3d 699, 708 (7th Cir. 2013). Simpson offered no evidence to show that Kelly lied in any of the reprimands or that the events documented in the reprimands are not what caused Kelly to discharge Simpson. Instead, Simpson simply speculates that Kelly's reasons could be pretextual, and that speculation is insufficient. *See Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 513 (7th Cir. 2012).

### III. Conclusion

Simpson did not establish a prima facie case of discrimination, nor did she introduce evidence from which a jury reasonably could conclude that St. James's proffered explanation for terminating her employment was pretextual. Accordingly, the district court's judgment is affirmed.